**CONSOLIDATED RAIL CORPORATION**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, et al.**

**Civ. A. No. 80–3147.**

United States District Court,
E. D. Pennsylvania.

April 14, 1982.

**654**

Hermon M. Wells, Henry H. Perritt, Jr., Philadelphia, Pa., Consol. Rail Corp., for plaintiff.

· John J. Gallagher, Asst. Counsel, Joseph J. Malatesta, Jr., Chief Counsel, Harrisburg, Pa., Pennsylvania Public Utility Commission, for defendants.

## MEMORANDUM

GILES, District Judge.

By statute, Pennsylvania requires locomotives to have speed recorders and indicators. 66 Pa.Cons.Stat. § 2705 (1978).[1]  Plaintiff

railroad, contending that the statute is preempted by federal law, sues the state[2] for a declaration that the statute is unconstitutional under the supremacy clause, U.S. Const. art. VI, cl. 2.  Before me is plaintiff's motion for summary judgment.  For the reasons which follow, the motion is granted.

The railroad contends that the state statute conflicts with two federal statutes, the Locomotive Boiler Inspection Act, 45 U.S.C. § 23 (1976), and the Federal Railroad Safety Act, *id.* § 434, and a federal regulation, 49 C.F.R. § 229.117 (1980).  The railroad argues that the Locomotive Inspection Act totally preempts the field of locomotive equipment, barring any state regulation of that subject.  Alternatively, the railroad argues that the state statute is independently preempted by the test of the Railroad Safety Act, because a federal rule covers the same subject matter as the state statute.

The state argues that Congress has redistributed railroad regulatory authority so that the total-preemption test of the Locomotive Inspection Act is no longer valid.  It contends that the correct tests are those stated in the Railroad Safety Act.  State regulation of speed recorders allegedly meets those tests because it does not cover the same subject matter as the federal regulation, or, if it does overlap, because it comes within the statutory exception of the Railroad Safety Act.[3]

---

1. That section states that:
   No railroad locomotive shall be operated in excess of 30 miles per hour in this Commonwealth without a device or devices making a record of the speed at which the locomotive is traveling and providing the engineer or operator of the locomotive with a view of such speed.  Both devices shall be functioning correctly within four miles per hour. 66 Pa.Cons.Stat. § 2705(a) (1978).  Other subsections: require railroads to notify the state Public Utility Commission, and keep records, of compliance, *id.* § (b)–(c); give rules for evidentiary use of speed records in disciplinary hearings, *id.* § (c); and give enforcement powers to the Commission, *id.* § (d).
   I note that because the statute exempts yard and commuter locomotives, *id.* § (b), it would not help reconstruct commuter-rail accidents.

2. The named defendants are the Pennsylvania Public Utility Commission (the state body

charged with enforcing the statute), its commissioners, and some of its officials.

3. The state does not defend its regulation of speed indicators, presumably because preemption is obvious.  *Compare* 66 Pa.Cons.Stat. § 2705(a) (quoted in note 1 *supra*)  *with* 49 C.F.R. § 229.117(a) (quoted in note 16 *infra*).
   I note that the cause of action arises under the Declaratory Judgment Act, 28 U.S.C. § 2201, and that jurisdiction exists under 28 U.S.C. § 1331.  Plaintiff has standing because it would suffer legal "injury" if the state law were enforced.  Despite the absence of a specific statutory penalty, the action is ripe because of the possibility of enforcement of the law under 66 Pa.Cons.Stat. §§ 502 & 503, and because the only factual development needed for adjudication is the minimal amount supplied by the parties. Plaintiff is a "common carrier" as defined in

## I. LOCOMOTIVE INSPECTION ACT

In the landmark *Napier* case, the Court held that Congress intended the Locomotive Boiler Inspection Act to occupy totally the field of locomotive equipment.[4] The Act, by itself, thus preempts state regulation of locomotive equipment. The state concedes that this was Congress's intent in passing the Locomotive Inspection Act.[5] The state, however, argues that "the rule of *Napier* ... has been abrogated" by the Federal Railroad Safety Act, 45 U.S.C. § 434. *See* State's Brief, *supra* note 5, at 2. Thus, the question whether the state statute is preempted by the Locomotive Inspection Act turns on whether the latter act's preemptive purpose was modified by the Railroad Safety Act.

Prior to passage of the Railroad Safety Act, federal law governed only a few areas of railroad safety. Congress found that this spotty federal coverage resulted in numerous preventable accidents. To remedy this problem it passed the Federal Railroad Safety Act. The Act aimed to promote railroad safety by insuring "broad Federal regulatory authority over all areas of railroad safety,"[6] and promoting "nationally uniform" railroad-safety standards.[7] While expanding the field for federal regulation, Congress also stated a narrower rule governing preemption of state law.[8] The state contends that this rule operates to limit the scope of preemption of the Locomotive Inspection Act.

That a reasonably strong argument exists in favor of the state's position is shown by Justice Roberts' opinion in *Norfolk & Western Railway Co. v. Pennsylvania Public Utility Commission*, 489 Pa. 109, 118–23, 413 A.2d 1037, 1042–44 (1980) (state law requiring flush toilets in locomotives not preempt-

the Locomotive Inspection Act, *see* 45 U.S.C. § 22, and a "railroad" subject to the Railroad Safety Act, *see id.* § 434; S.Rep.No.91–619, 91st Cong., 1st Sess. 6 (1969). Plaintiff is covered by, and in violation of, the state statute. *Pullman*-type abstention is inappropriate because the state statute's meaning and validity under state law are undisputed. Finally, *Younger*-type abstention is inappropriate because there are no ongoing state enforcement proceedings. *See also* Memorandum (Nov. 12, 1980) (denying motion to dismiss for lack of subject-matter jurisdiction).

**4.** In *Napier,* the Court invalidated state regulations of locomotive equipment. The Court decided that the regulations were valid exercises of the states' police power, and assumed that there was no actual conflict between state regulations and federal law. *Napier v. Atlantic Coast Line R.R.*, 272 U.S. 605, 610–11, 47 S.Ct. 207, 208–209, 71 L.Ed. 432 (1926) (Brandeis, J.). The validity of the state regulations thus hinged on the answer to the question: "Does the legislation of Congress manifest the intention to occupy the entire field of regulating locomotive equipment?" *Id.* 611, 47 S.Ct. 209. The Court answered that "the power delegated to the [Interstate Commerce] Commission by the Boiler Inspection Act as amended is a general one. It extends to the design, the construction and the material of every part of the locomotive and tender and of all appurtenances." *Id.* Thus, the Act, even absent exercise of federal regulatory power "was intended to occupy the field." *Id.* at 613, 47 S.Ct. at 210; *accord, Norfolk & W. Ry. v. Brotherhood of Locomotive Eng'rs,*

459 F.Supp. 136, 144 (W.D.Va.1978); *see Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 446 n.2, 80 S.Ct. 813, 817 (1960).

Regulatory authority under the Act since has been transferred from the ICC to the Secretary of Transportation. *See* 45 U.S.C. § 28; 49 U.S.C. § 1655(e)(1)(E). I also note that the Act is variously known as the "Locomotive Boiler Inspection Act," the "Boiler Inspection Act," and the "Locomotive Inspection Act." I shall use the last term.

**5.** *See* Memorandum in Opposition to Plaintiff's Motion for Summary Judgment at 1 [hereinafter cited as State's Brief].

**6.** H.R.Rep.No.91–1194, 91st Cong., 2d Sess. 11, [hereinafter cited as H.Rep.], *reprinted in* 1970 U.S.Code Cong. & Ad.News 4104, 4108; *see* 45 U.S.C. § 421 ("promote safety in all areas of railroad operations"); H.Rep., *supra* at 7–8, 73, 75, *reprinted in* 1970 U.S.Code Cong. & Ad.News at 4105, 4127, 4129; S.Rep.No.91–619, 91st Cong., 1st Sess. 1, 5–6·(1969) [hereinafter cited as S.Rep.].

**7.** 45 U.S.C. § 434; *see, e.g., National Ass'n of Regulatory Util. Comm'rs v. Coleman*, 542 F.2d 11, 13 (3d Cir. 1976); *Donelon v. New Orleans Terminal Co.*, 474 F.2d 1108, 1111 (5th Cir.), *cert. denied*, 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973); H.Rep., *supra* note 6, at 19, *reprinted in* 1970 U.S.Code Cong. & Ad.News at 4116–17; S.Rep., *supra* note 6, at 8–9, 19.

**8.** That rule comprises 45 U.S.C. § 434. *See* note 15 *infra* & accompanying text.

ed by Locomotive Inspection Act because Railroad Safety Act changes preemption test). I, however, disagree with the state's argument for two reasons. First, the legislative history of the Railroad Safety Act shows that Congress intended no change to the Locomotive Inspection Act. Second, elimination of the total-preemption test for locomotive equipment runs contrary to the purpose of the Railroad Safety Act.

In passing the Railroad Safety Act, Congress could have repealed the Locomotive Inspection Act, or recodified or subsumed it within the comprehensive Railroad Safety Act.[9] Instead, Congress concluded that the Locomotive Inspection Act was working well, and specifically determined to keep it independently in force "without change."[10] These decisions negate implied modification of any part of the Locomotive Inspection Act, including its total occupation of the locomotive-equipment field.[11]

In expanding the scope of federal rule-making authority in the Railroad Safety Act, Congress allowed the states to continue regulating until displaced by federal rules in the same area.[12] The continued validity of state rules in areas that had always been subject to state regulation does not make railroad regulation less uniform than in the past. Thus, the new preemption rule, as applied to new areas of federal railroad regulatory jurisdiction, does not impair the congressional purpose of uniform regulation.

In contrast, in areas already governed by the Locomotive Inspection Act, the states had no regulations. If the Railroad Safety Act were to change the preemption test for those areas, the states could expand their regulatory authority, allowing a new reservoir of differing, and possibly incompatible, railroad-safety law.[13] This would run counter to Congress's purpose of uniform na-

9. *See, e.g.*, S.Rep., *supra* note 6, at 11, 24 (proposed S.1933, 91st Cong., 1st Sess. § 107 (1969), would have repealed miscellaneous railroad-safety laws); *id.* at 16 (letter from Sec'y of Transp. James M. Beggs to Sen. Warren G. Magnuson (Dec. 2, 1969), recommending deferred repeal of Locomotive Inspection Act).

10. As stated in the House Report:
    Over the years there have been several enactments of legislation dealing with certain phases of railroad safety. These include, among others . . . [the] Locomotive Inspection Act . . . .
    They are set forth in appendix B of this report. These particular laws have served well. In fact the committee chose to continue them without change.
    H.Rep., *supra* note 6, at 7–8, *reprinted in* 1970 U.S.Code Cong. & Ad.News at 4105; *see* S.Rep., *supra* note 6, at 11.

11. *See e.g.*, *TVA v. Hill*, 437 U.S. 153, 189–90, 98 S.Ct. 2279, 2299–2300, 57 L.Ed.2d 117 (1978) (disfavor of implied repeal is cardinal rule, intent to repeal must be clear and manifest); *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 168–69, 96 S.Ct. 1319, 1322–1323, 47 L.Ed.2d 653 (1976) (disfavor of repeal by implication carries special weight when argument is that general statute repealed specific one); *New Jersey Air Nat'l Guard v. Federal Labor Relations Auth.*, No. 81–1592, slip op. at 19–20 (3d Cir. Apr. 12, 1982) (implied repeal disfavored, especially implied repeal of specific statute by general statute).

The continued independent vitality of the Locomotive Inspection Act is shown by the fact that the regulations cited in this case were adopted under the substantive and regulatory authority of that Act, 45 U.S.C. §§ 22–23 & 28. *See* 49 C.F.R. preceding § 229.1; 45 Fed.Reg. 21,092, 21,110 (1980) (adoption of final rule); 44 Fed.Reg. 29,605–06 (1979) (notice of proposed rulemaking). In contrast, the advance notice of proposed regulation invoked also the authority of the Railroad Safety Act, 45 U.S.C. § 431. *See* 39 Fed.Reg. 4930 (1974).
I also note that under the authority of the Locomotive Inspection Act, the Federal Railroad Administration decided not to require speed recorders. 44 Fed.Reg. 29,610–11 (1979); *see* note 19 *infra* & accompanying text.

12. *See* 45 U.S.C. § 434; H.Rep., *supra* note 6, at 11, 19, 75, *reprinted in* 1970 U.S.Code Cong. & Ad.News at 4108–09, 4116–17, 4130; note 15 *infra* & accompanying text.

13. *Cf., e.g.*, *Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 671, 101 S.Ct. 1309, 1316, 67 L.Ed.2d 580 (1981), *and Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978) (differing state rules on truck length); *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959) (incompatible state rules on shape of trailer mudguards); *Southern Pac. Co. v. Arizona*, 325 U.S. 761, 773–75, 65 S.Ct. 1515, 1522–1523, 89 L.Ed. 1915 (1945) (differing state rules on train length).

tional regulation.[14] It is contrary to Congress's purpose in passing the Railroad Safety Act to allow the states to reoccupy fields from which they previously had been displaced. Thus, I conclude that Congress did not intend the preemption provision of the Railroad Safety Act to modify the total-preemptive effect of the Locomotive Inspection Act.

■ The state statute regulates locomotive equipment, an area totally preempted by the Locomotive Inspection Act. Therefore, to the extent that the state is attempting to regulate railroad common carriers within the jurisdiction of the Interstate Commerce Commission, see 45 U.S.C. § 22, the state statute conflicts with federal law and violates the supremacy clause.

## II. FEDERAL RAILROAD SAFETY ACT

■ Even assuming, however, that the proper test for preemption is that stated in the Railroad Safety Act, the Pennsylvania statute is still preempted. The Railroad Safety Act allows state railroad-safety regulation of areas not covered by the "subject matter" of a rule adopted by the federal government. Furthermore, a state may regulate railroad safety in the same area as the federal government if the state rule relates to "an essentially local safety hazard" and meets other conditions.[15]

The Federal Railroad Administration has adopted a rule governing speed indicators in locomotives.[16] That rule requires locomotives to be equipped with speedometers. Because the rule does not require speed recorders, compare note 16 supra (federal rule), with note 1 supra (state statute), the state argues that its statute does not cover the same "subject matter" as the federal rule. Furthermore, the state contends that even if the subject matter is identical, the state law fits within the local-safety-hazard exception.

A speed recorder, "[i]n essence, . . . is a recording speedometer."[17] The speedometer and speed recorder often are incorporated in the same device, a fact recognized by the state statute.[18] Federal regulators thought speedometers and speed recorders belonged to the same subject matter. The

14. Cf. Swift & Co. v. Wickham, 230 F.Supp. 398, 407–08 (S.D.N.Y.1964) (Napier "decision as to the exclusivity of the Boiler Inspection Act must have been influenced by the paralyzing effect on railroads from prescription by each state of the safety devices obligatory on locomotives that would pass through many of them.") (Friendly, J.) (three-judge court), appeal dismissed, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965) (no direct appeal to Supreme Court), aff'd, 364 F.2d 241 (2d Cir. 1966), cert. denied, 385 U.S. 1036, 87 S.Ct. 776, 17 L.Ed.2d 683 (1967).

15. The exact language of the preemption section is:

The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the same subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.
45 U.S.C. § 434.

16. The rule provides:

(a) After December 31, 1980, each locomotive used as a controlling locomotive at speeds in excess of 20 miles per hour shall be equipped with a speed indicator which is—
(1) Accurate within ± 3 miles per hour of actual speed at speeds of 10 to 30 miles per hour and accurate within ± 5 miles per hour at speeds above 30 miles per hour; and
(2) Clearly readable from the engineer's normal position under all light conditions.
49 C.F.R. § 229.117(a) (1980). Subsection (b) provides for testing the speedometer as soon as possible after departure.

17. Adkins v. Dirickson, 523 F.Supp. 1281, 1283 (E.D.Pa.1981), appeal docketed, No. 82–1108 (3d Cir. Feb. 24, 1982); see Conrad, The Tachograph As Evidence of Speed, 8 Wayne L.Rev. 287, 288–91 (1962).

18. See 66 Pa.Cons.Stat. § 2705(a) (requiring "a device or devices"); note 1 supra; see also sources cited in note 17 supra.

Federal Railroad Administration discussed proposed speedometer and speed-recorder regulation under the same heading. *See* 39 Fed.Reg. 4929 (1974) (advance notice of proposed rulemaking).[19] This view of both devices as part of a unitary subject was shared by the Pennsylvania legislature, which regulated speedometers and speed recorders in the same sentence of the statute. *See* 66 Pa.Cons.Stat. § 2705(a); note 1 *supra*. I hold that regulation of speedometers and speed recorders is regulation of the same "subject matter"—speed indication or speed control. Because state and federal rules cover the same area, the Railroad Safety Act preempts the state law unless it is saved by the local-hazard exception.

The state statute, however, does not relate to a local safety hazard and makes no attempt at localization. On its face, the statute does not relate to a local problem. Speed indication, speed recording, and accident reconstruction generally affect interstate commerce and are national problems subject to national regulation. *See, e.g.,* 44 Fed.Reg. 29,610–11, 29,617 (1979); 39 Fed. Reg. 4929 (1974).

The state, however, argues that even if the law is not local in its language, it is local in intent and effect. The local hazard that the legislature intended to minimize is an allegedly unique, statewide problem resulting from the presence of hundreds of miles of high-speed railroad lines. *See* State's Brief, *supra* note 5, at 9. It is recognized that these high-speed lines cross Pennsylvania's borders and form part of the northeast corridor rail system. In *National Association of Regulatory Utility Commissioners v. Coleman*, 542 F.2d 11 (3d Cir. 1976), the state also argued that a statewide hazard was local. There, plaintiffs (including the Pennsylvania Public Utility Commission, *see id.* at 12,) challenged preemption of state accident-reporting require-

ments by federal regulations. One argument advanced by plaintiffs was that statewide requirements were "expressly excepted under the savings clause of Section 434." *Id.* at 14. That argument was "devoid of merit" then, *id.*, and is devoid of merit now.[20] Therefore, I hold that the state statute is not exempt from preemption under the Railroad Safety Act.

## III. CONCLUSION

It would be constitutionally impermissible to apply 66 Pa.Cons.Stat. § 2507 to railroads, such as plaintiff, which are subject to federal jurisdiction under the Locomotive Inspection Act or the Railroad Safety Act.

---

**19.** The proposed recorder regulations later were dropped. 44 Fed.Reg. 29,610–11 (1979) (notice of rulemaking).

**20.** For instance, the House Report states: "Since these local hazards would not be Statewide in character, there is no intent to permit a

State to establish Statewide standards superimposed on national standards covering the same subject matter." H.Rep., *supra* note 6, at 19, *reprinted in* 1970 U.S.Code Cong. & Ad.News at 4117; *see National Ass'n of Regulatory Util. Comm'rs*, 542 F.2d at 14–15.